LINDSAY, Judge.
This redhibition suit was filed by Mr. and Mrs. Thomas Jordan against their immediate vendor, Employee Transfer Corporation and Equitable Relocation Management Corporation. Employee Transfer Corporation (ETC) became Equitable Relocation Management Corporation after the sale of the house to the plaintiffs and before plaintiffs filed their suit. Other parties were added to the suit by way of third party demands filed against them by the defendant; among them, Jimmy and Suzanne Russell, sellers of the home to ETC; Terry Roberts d/b/a Century 21 — Roberts Realty, the real estate agency involved in the sale of the home; and David Key, the real estate agent who showed and sold the home. All parties filed exceptions of prescription which were referred to the merits. After the trial was completed, the trial judge sustained the exceptions of prescription and dismissed plaintiffs’ suit. We affirm.
The evidence reveals that in 1981 Mr. and Mrs. Thomas Jordan became interested in buying a home. They contacted David Key of Century 21 — Roberts Realty concerning the possibility of seeing some houses. On September 7, 1981, Key took the Jordans to a home at 125 Turtle Dove Drive, Monroe, Louisiana. Upon inspection of the home, the Jordans were shown cracks in the brick and were provided with an engineering report by Jerry Madden, a civil engineer. The Madden report noted the various cracks in the exterior and interior walls of the house. The report concluded that the cracks did not render the house structurally unsound and that the cracks were due to settlement caused by movement of the soil away from the foundation.
Mr. Key testified that on further inspection he removed some of the carpet from the floor of the home’s sunken den and showed the Jordans some gray material on the floor, later identified as a sealant. He testified that he told the Jordans of water having previously seeped into the sunken den and he stated that a Mr. Bell, the owner of the home prior to the Russells, had apparently fixed the problem. Although the Jordans claimed that they were only shown exterior cracks and were not informed of water having been in the sunken den, Mr. and Mrs. Russell testified that Key had informed them of the prior flooding before they purchased the house.
The Jordans were also informed of, but not shown, another engineering report; this one prepared by Mr. John Maroney, also a civil engineer. The Maroney report also states that the house was structurally sound despite the cracks in the walls resulting from the foundation settlement. Mr. Maroney felt that the foundation settlement was caused by improper compaction of the fill material used prior to construction of the house. He estimated that it would cost approximately $4,000 to underpin and jack up the house to restore it to its original position. The Jordans were not advised of Maroney’s conclusion that the expenditure of approximately $4,000 would be required for repairs.
The Jordans returned to their home after being shown the residence on Turtle Dove Drive. Late that same night Mr. Jordan met Mr. Key at Century 21 — Roberts Realty and made an offer to purchase. Key reminded Mr. Jordan of the Maroney report, but he was unable to locate a copy to give Mr. Jordan. Mr. Jordan appeared unconcerned and allowed Mr. Key to transmit the offer to the Russells. The offer was accepted shortly thereafter. The house was purchased by ETC in compliance with a contract between ETC and Mr. Russells’ employer. Within a few weeks the home was resold by ETC to the Jordans in a sale that was finalized on October 14, 1981.
The Jordans experienced no problems with their home until a heavy rain fell during the night of September 30 and early morning of October 1, 1982. During that rain the sunken den was flooded.
The Jordans contacted Weil Cleaners, a company which specializes in cleaning *456 homes after fires and floods. Donny Weil, an employee, was sent to the Jordans’ home in order to take up the carpet and begin cleaning the flooded area. The Jor-dans inquired of Weil as to the actual cause of the flooding. Weil pointed out several possibilities, including leaks where the roof and chimney meet. He also suggested that water might be seeping through the foundation. Weil pointed out the sealant which had been previously used on the concrete floor and he advised the Jordans that the use of sealant on a concrete floor underneath carpeting was unusual. Additionally, he recommended that an engineer or contractor be contacted in order to determine the exact cause of the flooding.
The Jordans did not contact anyone to determine the cause of the flooding. However, an insurance adjuster advised Mr. Jordan that he might attempt to patch any possible leaks between the roof and chimney by applying tar to that area. Mr. Jordan attempted this repair job himself. The Jordan’s also contacted ETC several times about the problems. Mr. Jordan claimed that various representatives of ETC said that “everything would be taken care of.” However, we conclude that ETC made no representations to the Jordans that they would make any repairs or attempt to determine the cause of the flooding.
The sunken den did not flood again until December 1, 1982 when another heavy rain occurred. Because the Jordans had never replaced the carpeting for fear of further damage, it then became evident that the water was seeping up through the foundation. The Jordans filed suit on December 1, 1983.
A suit in redhibition must be instituted within a year, commencing from the date of the sale, in order to avoid prescription. LSA-C.C. Art. 2534. However, if the seller is in bad faith, the suit may be commenced at any time, provided a year has not elapsed since the discovery of the vice. LSA-C.C. Art. 2546. In the instant case, the trial judge determined that the sellers of the home were in bad faith, primarily because the Jordans were not informed of Mr. John Maroney’s conclusion that it would cost approximately $4,000 to underpin and jack up the house in order to restore it to its original position.
We accept the trial judge’s conclusion that the sellers were in bad faith for the purpose of discussing the issues raised on appeal. Because the sellers were in bad faith, prescription did not commence to run until plaintiffs discovered the vice. Plaintiffs contend that the water seepage which occurred on October 1,1982 was a result of the vice, and not the vice itself. The defective foundation was not discovered until December 1, 1982 when the second rainfall occurred. Therefore, they argue, prescription should not commence to run until the cause of the seepage was discovered, i.e., December 1, 1982.
In support of their contention plaintiffs cite Hill v. John L. Crosby, Inc., 353 So.2d 421 (La.App. 4th Cir.1977). In Hill, it was held that the applicable prescriptive period was one year from the date the homeowners learned of the cause of the vice, even though they knew of the existence of the vice (mildewing and rotting boards) for several years before a testing laboratory advised them of the cause of the problem (improper construction and waterproofing of boards which allowed water to enter, resulting in mildew and rotting).
Hill was a one judge opinion in which one other member of the panel concurred in the result on completely different grounds, which are not applicable here, and the third judge dissented. The dissenting judge concluded, as we do in this case, that the discovery of the vice, rather than discovery of the cause thereof, began the running of prescription.
We decline to follow Hill, supra, determining that the weight of the jurisprudence holds that prescription begins to run when the purchaser has constructive notice of the existence of a vice. In Cartwright v. Chrysler Corporation, 255 La. 597, 232 So.2d 285 (1970), the court stated that whatever is notice enough to excite attention and put the owner on his guard and *457 call for inquiry is tantamount to knowledge or notice of everything to which inquiry may lead and such information or knowledge as ought to reasonably put the owner on inquiry, is sufficient to start the running of prescription.
A situation analagous to the present case existed in Lee v. Equitable Life Assurance Society of the United States, 391 So.2d 37 (La.App. 3rd Cir.1980). Therein, the plaintiff had purchased a home on October 18, 1977. In either December of 1977 or January of 1978, the plaintiff noticed water seeping into the den and attempted to remedy the problem by ditching and reshaping the hillside upon which his house was situated. However, this effort did not prove successful. In January of 1979 the plaintiff was advised that the house was constructed adjacent to a “spring,” and that whenever a substantial rain occurred the spring flowed against the house causing water to seep into the den. Plaintiff filed suit on March 8, 1979, over one year from both the date of the sale and the time when plaintiffs first noticed the water seepage.
The plaintiff contended that the water seepage was a result of the vice and not the vice itself, therefore, prescription should not commence until January of 1979 when the cause of the seepage was discovered.
The Third Circuit declined to follow Hill, supra, stating that the dissenting opinion in that case more correctly represented the present state of the jurisprudence regarding this issue. Both the Hill dissent and the Lee court felt that the Hill decision was inconsistent with the rationale of Ray v. Cuccia, 298 So.2d 840 (La.1974). In Ray, the court held that it was not incumbent upon the purchaser to prove the exact or underlying cause of a malfunction in order to recover in an action for redhibition. Therefore, the court in Lee stated that it would be inconsistent to hold, on the one hand, that a purchaser need not establish the underlying cause of a defect in order to recover in redhibition, and on the other hand, to hold that although the defect is manifest, prescription is suspended until the purchaser actually discovers its underlying cause. Thus, the court held that the plaintiff was on notice that a defect existed in the house when he first discovered water seeping into the den. This notice was sufficient to commence the running of prescription applicable to redhi-bitory actions; i.e., constructive notice under Cartwright, supra. Hence, plaintiffs cause of action had prescribed.
Lee was also followed in Payne v. Trichel, 397 So.2d 16 (La.App. 3rd Cir.1981). In Payne, plaintiffs filed a suit in redhibition because the home they purchased developed cracks in the floor and in other areas. The issue presented was whether appellants were saved from the effect of the one year prescription applicable to red-hibition on the ground that they did not learn the cause of the cracking of the floor and other parts of the house until less than one year from the time they filed suit. The Hill case was again discussed but the court declined to follow it and instead followed Lee, and held that prescription began to run when plaintiffs learned of the vice, i.e., the cracks in the floor and elsewhere. See also Blalock v. American Employer’s Insurance Company, 345 So.2d 166 (La.App. 2d Cir.1977); Bennett v. General Motors Corporation, 420 So.2d 531 (La.App. 2d Cir.1982).
In the instant case, we determine that the discovery of the vice occurred when the plaintiffs acquired constructive notice of the defect. This occurred no later than October 1, 1982, when the Jordans’ sunken den was flooded. Hence, the Jordans’ cause of action in redhibition had prescribed by the time suit was filed on December 1, 1983.
For the above and foregoing reasons, the judgment of the trial court sustaining the defendants’ peremptory exception of prescription is affirmed. All costs are assessed against the plaintiffs-appellants.
AFFIRMED.