509 So.2d 420 (1987)
Thomas William JORDAN and Patricia Smith Jordan
v.
EMPLOYEE TRANSFER CORPORATION and Equitable Relocation Management Corporation.
No. 87-C-0004.
Supreme Court of Louisiana.
June 22, 1987.
C. Daniel Street, Bruscato, Loomis & Street, Monroe, for applicant.
Lavalle Salomon, Davenport, Files & Kelly, Charles Smith, Hayes, Harkey, Smith & Cascio, Charles Trascher, III, Snellings, Breard, Sartor, Inabnett & Trascher, Monroe, for respondent.
DIXON, Chief Justice.
The issue in this redhibition suit is when prescription began to run. Thomas William Jordan and his wife, Patricia Smith Jordan, bought a house on October 14, 1981 from the defendant, Employee Transfer Corporation (which later became Equitable Relocation Management Corporation). On *421 the night of September 31, and the morning of October 1, 1982, a significant rain flooded the Jordans' den. The Jordans attempted to find and repair the leak, but on November 31, and December 1, 1982, a second rain flooded the room again. The Jordans filed suit against Equitable Transfer Corporation on December 1, 1983. Thereafter, Employee Transfer Corporation filed third party claims against the broker who sold the house (Terry Roberts, d/b/a Century 21/Robert's Realty), the realtor who arranged for the sale (David Key), and the prior owners of the house (Mr. and Mrs. Russell). After a trial on the merits the trial court maintained an exception of prescription based on C.C. 2534. The court of appeal affirmed (499 So.2d 454 (La.App. 2d Cir.1986)) and this court granted writs.
On August 7, 1981 the Jordans contacted David Key in response to a newspaper ad listing the house for sale. At about 4:00 or 5:00 p.m. that day, the Jordans met Key to see the house which at this time was owned by Mr. and Mrs. Russell. After arriving, Key first showed the house exterior to the Jordans and pointed out cracks in the wall.
The Jordans testified Key said the cracks were only cosmetic and could be repaired for about $110. Key showed them a copy of the report prepared by a civil engineer, Jerry Madden, which concluded the house was not structurally unsound. The Jordans stated that Key informed them that Madden would be liable if his report was found to be incorrect. At no time did Key mention the existence of a second report prepared by John Maroney. The Maroney report had been commissioned by Employee Transfer Corporation after Key informed its representative of both the cracks in the exterior walls and the prior owner's difficulty with water damage. Key did not tell the Jordans of the original owner's problems with water leaking into the den.
Key's version of how he showed the Russells' house differed substantially from the Jordans' rendition. Key testified that he did not discuss with the Jordans how the cracks could be repaired. He claims he simply showed the cracks to the prospective purchasers and handed them a copy of the Madden report. Key admitted he had received a copy of the Maroney report prior to showing the house to plaintiffs and claims to have informed the Jordans of the second report's existence though not its contents. Key claims to have found the conclusions reached by both engineers to have been essentially the same. Key denied that he told the plaintiffs that Madden would be responsible if his report was found to be incorrect. Key testified that he not only discussed the problems that the original owners had had with water in the den but even pulled up part of the carpet to show where sealant had been applied to keep water out. He assured the Jordans that the leak had been repaired.
The Jordans spent thirty to forty-five minutes looking at the house. They were enthusiastic about the large yard and the den that was lower than the rest of the house, giving it a sunken effect. After returning home, the Jordans decided to make an offer to purchase the house. They phoned Key's office at about 11:00 p.m. that night to arrange to make an offer. Key testified that he unsuccessfully tried to find the Maroney report when Mr. Jordan came to his office that night. The Jordans made an offer that was accepted the next day.
Before closing the sale, the Russells sold the property to a transfer corporation that would arrange for the sale of the property for a specified price and then return any other profits to the Russells. This transfer corporation, Employee Transfer Corporation, was used by Mr. Russell's employer to facilitate the sale of employees' houses that were necessary due to a job transfer. For this reason, Employee Transfer Corporation was the owner of the property at the time of the closing on October 14, 1981.
After a rainstorm that ended on October 1, 1982, Mrs. Jordan found the carpet in the sunken den soaked. Mr. Jordan called their insurer and then called Weil Cleaners to remove the wet carpet. When Donnie Weil arrived to remove the carpet, he pointed out to Mrs. Jordan that moldy sideboards indicated that the den had flooded *422 before. Weil testified through deposition that Mrs. Jordan seemed surprised that there had been prior water damage. When the carpet was picked up, Mrs. Jordan could see where sealant had covered some cracks in the middle of the den floor. The cleaning man suggested that the water in the den could have been caused either by the flashing on the roof around the chimney, by cracks in the foundation or perhaps by a broken pipe.
After inspecting the house, the insurance adjuster concluded that the water had probably come in from a leaking flashing where the chimney met the roof. The adjuster agreed to pay for all the damage, minus the deductible.
At this point, the Jordans were confident that the foundation was sound because of both Key's reassurances and the civil engineer's report they had read. Furthermore, the insurance adjuster agreed to assume liability for the damage based on an assessment that the water had entered through the flashing. Mr. Jordan repaired the flashing with tar as the insurance company representative had instructed.
On December 1, 1982, the den flooded a second time. This time the Jordans were able to see water seeping in through the foundation.
Mr. Jordan went to Robert's Realty and met with Terry Roberts. Mr. Jordan obtained a copy of the Madden report and was also given a report prepared by John Maroney dated August 21, 1981. The Maroney report noted the cracking in the walls and found that, although the house was not in danger of collapsing, the foundation was structurally damaged. The report concluded, "If the house should be underpinned and jacked up into its original position, it would cost approximately $4000." The Jordans filed suit in redhibition on December 1, 1983 to rescind the sale and obtain damages.
A suit in redhibition must be filed within one year of the date of sale unless the seller had knowledge of the vice and neglected to inform the purchaser. C.C. 2534. If the seller fails to disclose to the purchaser a known redhibitory vice at the time of the sale, he is in bad faith. This bad faith operates to suspend the running of prescription until the purchaser discovers the vice. This discovery is not presumed. The seller has the burden to prove by a preponderance of the evidence that the purchaser discovered the vice more than one year prior to when suit was filed. C.C. 2546; Tuminello v. Mawby, 57 So.2d 666 (La.1952).
By his own admission, Key neither showed the Jordans the Maroney report nor fully disclosed its contents. The trial court and the court of appeal correctly concluded that this failure to disclose put the seller in bad faith and suspended the running of prescription until the Jordans were found to have discovered the vice.
When the Jordans first discovered water in their den, they reasonably suspected that the water had entered between the flashing and the chimney. The insurance adjuster, whose job was in part to identify the origin of damage, had reached the same conclusion. The Jordans reasonably relied upon the Madden report's conclusion that the foundation was not structurally unsound as well as Key's representations. For these reasons, the Jordans made a reasonable decision to attempt to repair the flashing and see if that cured the problem. The Jordans did not discover the origin of the leak until the second substantial rainfall, about two months later. By this time, the carpet had been removed and water could be seen seeping through the den floor.
The court of appeal followed Lee v. Equitable Life Assurance Society of the United States, 391 So.2d 37 (La.App. 3d Cir.1980) which had held that plaintiff Lee noticed water seeping into his den and had undertaken certain drainage repairs more than a year before filing the suit. There was no question about the source of the water. In the Lee case the court of appeal held such notice sufficient to start the prescription period running, and quoted dicta[1] *423 from our opinion in Cartwright v. Chrysler Corporation, 255 La. 597, 232 So.2d 285, 287 (1970).
The court of appeal in the instant case paraphrased the same dicta, as if it had been the rule in Cartwright. It was not. Mrs. Cartwright had been rear-ended by Dr. Kent's Chrysler. At the scene of the wreck Dr. Kent told Mrs. Cartwright that his brakes had failed. Mrs. Cartwright sued Dr. Kent, who was successful at trial in proving sudden failure of his brakes. Then, more than a year after she had been damaged, Mrs. Cartwright sued Chrysler Corporation. This court sustained Chrysler's plea of prescription, holding:
"While this court has accepted in certain limited situations the common law doctrine `contra non valentem agere nulla currit praescriptio,' which means that prescription does not run against a person who could not bring his suit, we do not think that plaintiff can find any comfort under the facts of this case in that doctrine. The rule that prescription does not run against one who is ignorant of the existence of facts that would entitle him to bring suit, applies only when such ignorance is not wilful and does not result from negligence, and the doctrine has been limited to cases where the debtor has concealed the fact of the obligation or has committed other acts which tend to hinder, impede or prevent the creditor from ascertaining knowledge of the existence of the debt...." Cartwright v. Chrysler Corporation, supra [232 So.2d] at 287. (Underscoring added).
The Cartwright opinion then added two sentences about "constructive notice," which is sometimes cited as the rule of the Cartwright case. Mrs. Cartwright, however, had actual notice, from the day of the accident through pretrial and trial, that Dr. Kent blamed the Chrysler's brakes for suddenly failing and causing the accident.
Recent decisions of this court, particularly in the medical malpractice area, have clarified the kind of "notice" that starts the running of liberative prescription. In Young v. Clement, 367 So.2d, 828, 830 (La.1979), this court held, "Prescription does not run against one who is ignorant of the existence of facts that would entitle him to bring a malpractice action, as long as such ignorance is not willful and does not result from his neglect," citing Henson v. St. Paul Fire & Marine Insurance Co., 363 So.2d 711 (La.1978).
In Cordova v. Hartford Accident & Indemnity Co., 387 So.2d 574, 577 (La.1980), this could held, "The mere apprehension by plaintiff that `something was wrong' is not sufficient to start prescription unless plaintiff knew or should have known by exercising reasonable diligence that there was a reasonable possibility that his problem ... may have been caused by acts of malpractice."
Recently, in Griffin v. Kinberger, 507 So.2d 821, 823 (La.1987), this court explicitly noted that this language in Cartwright v. Chrysler Corporation, supra had been "refined" to focus on the reasonableness of a tort victim's action or inaction. The court concluded, "prescription does not run as long as it was reasonable for the victim not to recognize that the condition may be related to the treatment."
The language in Cartwright, quoted in footnote 1, is an incomplete definition of the kind of notice that will start the running of prescription. Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage. On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury.
When prescription begins to run depends on the reasonableness of a plaintiff's action or inaction. The Jordans knew there was damage on October 1, 1982, when they *424 discovered the water in their den. However, prescription did not begin to run until they had a reasonable basis to pursue a claim against a specific defendant. This did not occur until December 1, 1982, when the plaintiffs had a reasonable basis to conclude that Key's assurances and the Madden report were incorrect. Since the Jordans filed suit on December 1, 1983, prescription had not yet run.
For the above reasons, the judgments in the trial court and the court of appeal sustaining defendant's exception of prescription are reversed at the cost of defendants-respondents, and the case is remanded to the trial court for a decision on the merits.
NOTES
[1] "... Whatever is notice enough to excite attention and put the owner on his guard and call for inquiry is tantamount to knowledge or notice of every thing to which inquiry may lead and such information or knowledge as ought to reasonably put the owner on inquiry is sufficient to start the running of prescription."