629 So.2d 1295 (1993)
Joycelyn and John APRIL, Jr.
v.
ASSOCIATED CATHOLIC CHARITIES OF NEW ORLEANS, et al.
No. 93-C-2079.
Court of Appeal of Louisiana, Fourth Circuit.
December 16, 1993.
*1296 C. William Bradley, Jr., Richard E. Gruner, Jr., Lemle & Kelleher, New Orleans, for relator.
Gerald Wasserman, Bach & Wasserman, Metairie, for respondents.
Before BYRNES and WARD and PLOTKIN, JJ.
BYRNES, Judge.
The plaintiffs-respondents, Joycelyn and John April, filed suit after they discovered their adopted son suffers from fetal alcohol syndrome. The petition alleged the plaintiffs-respondents learned of the condition August 21, 1990 from a letter from Dr. Jonelle McAllister, a pediatric neurologist; and that the defendant-relator, Associated Catholic Charities, breached its duty of care by: (1) failing to obtain and disclose a full and complete history of the child's parents; (2) representing the child was normal; (3) failing to monitor the birth mother during pregnancy; and (4) failing to comply with an agreement to furnish financial assistance for a "special needs child." The plaintiffs sought damages for medical care, lost wages due to additional time required to supervise the child, and mental anguish. They also sought the child's prenatal medical records and background information. They asked that the birth parents be located so that inquiries could be made in order to assist in a diagnosis of the child's genetic disorders.
Associated Catholic Charities filed exceptions of no cause of action and prescription. It argued that Louisiana does not recognize an action for "wrongful adoption" and that the suit is prescribed because the plaintiffs knew of the child's problems as early as 1985 when he had his first seizure, but certainly by April 2, 1990 after the adoptive mother saw a movie and read a book on fetal alcohol children and then contacted Dr. McAllister on April 2, 1990. The exceptions were denied, and the relator applied for writs to this Court.
The writ application was granted in part and denied in part on April 21, 1993. This Court agreed with the trial court's ruling on the exception of no cause of action because the plaintiffs had stated a cause of action in contract for a special needs child. This Court specifically stated that it would not consider the issue of whether Louisiana would recognize a cause of action for wrongful adoption because a partial granting of an exception of no cause of action would be improper. This Court then concluded that the defendant did have a right to a ruling on the exception of prescription as to any tort claim. The panel ordered that the exception be tried and decided in advance of trial, reversing the trial court's ruling deferring the exception of prescription to the trial on the merits. The exception was remanded for a hearing.
The defendant is now before this Court applying for supervisory writs to review the trial court's judgment denying the exception of prescription. No written reasons were assigned. It appears from the writ record before this Court that the trial court heard no testimony but made its decision based on argument of counsel, depositions, and medical records.
The adopted child, Christopher April, was born on June 19, 1984. He was placed with the plaintiffs on June 25, 1984. The final decree of adoption was signed on May 8, 1985. In February 1985 when Christopher was eight months old, he suffered a seizure and was hospitalized for three days. A pediatric neurologist, Dr. McAllister, was called in and placed the baby on medication to control his seizures. One week after discharge, Dr. McAllister was consulted for a follow-up examination. At that time, she informed the plaintiffs that the child was microcephalic (small-headed) and that the *1297 seizures could have been caused by that condition. Dr. McAllister also informed the plaintiffs that the condition could be hereditary. According to the deposition testimony of Mrs. April, Dr. McAllister asked for information about the birth parents to determine if the microcephalic condition were in fact hereditary. Mrs. April contacted Associated Catholic Charities and was given the background information obtained by them from the birth mother prior to the entry of the final adoption decree.
The plaintiffs first noticed hyperactive behavior when Christopher began walking at age one. They had been forewarned of this possible behavior by Dr. McAllister. It was caused by the anti-seizure medicine.
Between his first and second year Christopher experienced no particular problems, according to Mrs. April, and was maintained on his medicine. In 1986 at age two, Christopher was placed in a "Mother's Day Out" program. The staff at the school reported that he was extremely hyper and referred the plaintiffs to the Jefferson Parish School Board for evaluation. Based on that evaluation, including a finding that his speech development was slow, the school system placed Christopher in special education commencing at age three. From age three to age five he remained in a special class at Marie Rivere school. He was then placed into another special education class for behavioral disorders and emotional disturbance.
In early 1990 Mrs. April saw a movie and read a book about fetal alcohol syndrome. She recognized some of the symptoms, including the microcephaly, which her son had. In August 1990 Christopher was seen by Dr. Diane Africk who diagnosed his condition as mild Fetal Alcohol Syndrome. Dr. Africk did not undertake any treatment because none is available. Mrs. April learned of Dr. Africk's expertise on fetal alcohol syndrome when she saw her on television in July 1990.
In Dr. McAllister's deposition, she testified about diagnosing Christopher's microcephaly when she first saw him and that she informed the parents there would be problems in future years. In 1986 Dr. McAllister discussed sending Christopher to a geneticist for testing to determine if there might have been a genetic disorder. The parents were not receptive to the idea, and Dr. McAllister did not make an issue of it because the results would not affect treatment. Therefore, no genetic testing was done. Thereafter, Dr. McAllister monitored Christopher's progress and reaction to medications. She saw him only twice a year but spoke on the phone to Mrs. April frequently.
On April 2, 1990 Mrs. April phoned Dr. McAllister and asked if she thought Christopher could have fetal alcohol syndrome. Dr. McAllister answered that she did think so, and had thought so "for a while."[1] Dr. McAllister had not previously mentioned that she thought Christopher had fetal alcohol syndrome because putting a label on his symptoms would not change the treatment. After Mrs. April saw Dr. Africk on television, she called Dr. McAllister and they discussed fetal alcohol syndrome again. On July 30, 1990 Dr. Africk saw Christopher. According to Dr. Africk's notes which were prepared on August 22, 1990, she told Mrs. April that she thought Christopher certainly had some of the symptoms of fetal alcohol syndrome but that it was a diagnosis of exclusion. Dr. Africk suggested that the only genetic testing that the parents might want done would be for Fragile X chromosome. This was the same genetic testing that Dr. McAllister had suggested when Christopher was an infant.
On August 21, 1990 Dr. McAllister executed a letter styled "to whom it may concern" in which she stated that Christopher was a six year old child with epilepsy, microcephaly, and severe behavior disorder; that he also was mildly mentally retarded, and suspected of having fetal alcohol syndrome.
The plaintiffs filed the suit against the relator, Associated Catholic Charities, on July 16, 1991. They contend that prescription did not commence running until the August 21, 1990 letter from Dr. McAllister. The relator argues that the one year prescriptive *1298 period began, at the latest, on April 2, 1990 which is the date Mrs. April called Dr. McAllister and was told that the doctor believed Christopher had fetal alcohol syndrome. Additionally, the relator argues that on June 11, 1990 Mrs. April called Associated Catholic Charities and inquired about assistance for a "special needs" child. Also a June 26, 1990 memo in the file for the Aprils reflects that inquiries had been made about special medical assistance for children with fetal alcohol syndrome.
The doctrine of contra non valentem agere non nulla currit praescriptio may suspend the running of prescription during the period in which the cause of action was not known by or reasonably knowable by the plaintiff. Harlan v. Roberts, 565 So.2d 482 (La.App.2d Cir.), writ denied, 567 So.2d 1126 (La.1990). In Jordan v. Employee Transfer Corp., 509 So.2d 420 (La.1987), the Louisiana Supreme Court held that prescription begins to run, not at the earliest possible indication that the plaintiff may have suffered some wrong, but rather when the plaintiff has a reasonable basis to pursue a claim against a specific defendant.
As this Court stated in Mistich v. Cordis Mfg. Co., 607 So.2d 955, 956 (La.App. 4th Cir.1992):
As a general rule prescription begins to run when plaintiff has actual or constructive notice of the alleged tortious act. Castrillo v. Stimulation Technology, Inc., 393 So.2d 772, 774 (La.App. 4th Cir.1980). When there is notice enough to excite plaintiff's attention and put her on guard to prompt further inquiry, this is tantamount to knowledge or notice of everything to which inquiry might lead. This sort of knowledge or inquiry which ought to reasonably put plaintiff on notice is sufficient to start the running of prescription. Cartwright v. Chrysler Corporation, 255 La. 597, 232 So.2d 285 (1970).
Contra non valentem is an exceptional remedy recognized by our jurisprudence which is in direct contradiction to articles in the Civil Code and therefore should be strictly construed. Corsey v. State Department of Corrections, 375 So.2d 1319 (La.1979); Harsh v. Calogero, 615 So.2d 420 (La.App. 4th Cir.1993).
Prescription commenced to run no later than April 2, 1990. On that date, Mrs. April spoke with Dr. McAllister. According to the doctor, she agreed with Mrs. April that Christopher had fetal alcohol syndrome. Dr. McAllister's letter of August 21, 1990 is a confirmation of what Dr. McAllister had already told Mrs. April on April 2, 1990. There is nothing in Dr. McAllister's deposition testimony to indicate that the August 21, 1990 opinion was the result of information received after April 1990.
Furthermore, as noted by the relator, the Associated Catholic Charities' files indicate that in June 1990 Mrs. April acted upon her belief that Christopher suffered from fetal alcohol syndrome by calling the agency and seeking financial assistance. In her deposition Mrs. April stated that she called Associated Catholic Charities after going to see Dr. Africk. The records of Associated Catholic Charities indicate earlier dates.
In their petition, the plaintiffs allege that Associated Catholic Charities failed and/or refused to provide any background information on the natural parents. However, in Mrs. April's deposition she testified that after Christopher had his first seizure, she requested this information from Associated Catholic Charities and it was provided to her. This occurred before the adoption decree had been finalized. The plaintiffs also allege in their petition that they knew that Christopher was microcephalic, "but did not know that his condition would develop into an incurable illness that would require ongoing medical care, maintenance, and support for the remainder of his life." They then allege that not until Dr. McAllister's letter of August 21, 1990, did they learn that Christopher "may have a permanent irreparable impairment, i.e. Fetal Alcohol Syndrome." Again, Dr. McAllister's deposition clearly shows that she informed the Aprils from the time she first saw Christopher, when he was eight months old, that the microcephaly would cause him permanent problems.
Mrs. April in her deposition confirmed that Dr. McAllister had informed her that the baby was microcephalic which could be the *1299 cause of seizures. Mrs. April stated that Dr. McAllister informed her that the microcephaly was possibly of hereditary origin, i.e, genetic. Mrs. McAllister also acknowledged that Dr. McAllister told her that he might develop hyperactive behavior which did in fact commence when he started walking. The Aprils were further alerted to permanent problems when Christopher was two and was sent for evaluation and again when he entered kindergarten at age five and had to be assigned to an education class. This evidence of permanent impairment, although not formally diagnosed as fetal alcohol syndrome was certainly enough to put them on notice that Christopher April had a serious genetic disorder.[2] The symptoms were obvious and the Aprils were well aware of them. As Dr. McAllister pointed out, adding a label to the symptoms would have changed nothing. It would not have altered treatment and it would not have furnished the Aprils with any practical information they did not already possess. It is Christopher's condition that gives rise to the April's complaint, not the label attached to that condition. Therefore, it is highly likely that prescription began running many years before the plaintiffs filed suit on July 16, 1991. In no event did it begin less than one year prior to that date. Therefore, any cause of action which plaintiffs might have sounding in tort has prescribed.
For the foregoing reasons the ruling of the trial court is reversed, and the exception of prescription filed by Associated Catholic Charities is hereby granted as to any cause of action arising from tort.
REVERSED.
NOTES
[1] Dr. McAllister testified at her deposition that she had recognized Christopher's symptoms ever since she had read the book The Broken Cord. This was the same book and movie which Mrs. April had later read and seen.
[2] It is relevant to note that when Dr. McAllister initially suggested genetic testing for Christopher the plaintiffs did not agree to any such testing.