# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 07-117


SARWAT GAD, M.D., ET AL.

VERSUS

ROBERT RAY GRANBERRY, ET AL.


************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF LAFAYETTE, NO. 2002-1616,
HONORABLE EDWARD D. RUBIN, DISTRICT JUDGE

************

## MICHAEL G. SULLIVAN
## JUDGE

************

Court composed of Michael G. Sullivan, Billy Howard Ezell, and J. David Painter, Judges.


**REVERSED AND REMANDED.**

William L. Melancon
Elizabeth A. Macmurdo
Melancon & Associates
900 South College Road, Suite 300
Lafayette, Louisiana  70503
(337) 233-8600
Counsel for Plaintiffs/Appellants:
    Melissa Gad
    Sarwat Gad, M.D.

David J. Krebs
Krystil B. Lawton
H. S. Bartlett, III
Krebs, Farley & Pelleteri
400 Poydras Street, Suite 2500
New Orleans, Louisiana  70130
(504) 299-3570
Counsel for Defendant/Appellee:
    Dryvit Systems, Inc.

**C. Michael Pfister, Jr.**
**Joseph G. Glass**
**Duplass, Zwain, Bourgeois, Morton,**
**Pfister & Weinstock**
**3838 N. Causeway Boulevard, Suite 2900**
**Metairie, Louisiana 70002**
**(504) 832-3700**
**Counsel for Defendants/Appellees:**
      **Van Eaton & Romero, Inc.**
      **Melanie Lunn**

**Sharon B. Kyle**
**James L. Hilburn**
**Nancy A. Richeaux**
**Sharon B. Kyle, A.P.L.C.**
**4960 Bluebonnet Boulevard, Suite A**
**Baton Rouge, Louisiana  70809**
**(225) 293-8400**
**Counsel for Defendant/Appellee:**
      **Robert Ray Granberry**

SULLIVAN, Judge.

Plaintiffs, Dr. and Mrs. Sarwat Gad, appeal the dismissal of their redhibition suit on execptions of prescription filed by Defendants, Robert Ray Granberry, the vendor of the home that is the subject of this suit; Melanie Lunn and Van Eaton and Romero, Inc. ("Van Eaton"), the real estate agent and firm that represented Mr. Granberry in the sale; and Dryvit Systems, Inc. ("Dryvit"), the manufacturer of the home's Exterior Insulation and Finish System ("EIFS"). For the following reasons, we reverse and remand.

## Discussion of the Record

On June 30, 1995, the Gads purchased a 6,353-square-foot home in Broussard, Louisiana, from Mr. Granberry for $550,000.00. The Gads filed suit on March 26, 2002, alleging that they did not discover certain redhibitory defects caused by moisture intrusion through the home's EIFS until late 2001 and, further, that all Defendants were aware of the defects but failed to disclose them before the sale. Mr. Granberry, Ms. Lunn and Van Eaton, and Dryvit each filed exceptions of prescription, contending that the Gads had actual knowledge of the defects complained of over one year before filing suit based upon numerous pre-sale and post-sale inspection reports detailing moisture problems with the house. The Gads responded that they did not have any knowledge of water seeping through the EIFS until late 2001 or early 2002, when an architect removed the EIFS walls to better inspect the flashing system and unexpectedly found mold growing behind ninety percent of the home's exterior walls. The trial court agreed with Defendants, granting all three exceptions of prescription.

Prior to the sale, the Gads had the home inspected by a structural engineer, a home inspector, and a termite company. Russell Bellard, the structural engineer,

issued a report stating that the EIFS, or Dryvit system, appeared to be performing well, with no signs of stress. He noted minor drywall cracking and hairline cracks in the Dryvit, but he did not find that these conditions presented any serious structural concerns. He also noted water penetration in various areas that resulted in window problems, which he attributed to "construction techniques in the dormers." Mr. Bellard recommended recaulking, some drywall refinishing, and employing a skilled carpenter to investigate, modify, and repair the windows where damage was noted. Gulf States Inspection Consultants, Inc. ("GSIC") also issued a detailed home inspection report noting several instances of "cosmetic water damage" that was "due to roof run off." That report recommended correcting the cosmetic water damage caused by "roof run off capillary action"; installing a guttering system for preventive maintenance; monitoring and repairing the dormers, roof components, and chimney flashings as needed to insure watertight conditions; and normal cosmetic repairs, such as caulking, sealing, painting, and weather stripping. The wood destroying insect report by Sterling Pest Control, Inc. noted the water rot found by Mr. Bellard and GSIC and stated that such condition was conducive to infestation, but it did not find evidence of an active infestation.

Shortly after the sale, the Gads hired Andrus Construction Company to make the recommended repairs that included caulking, sealing, and changing window frames. They later had some roofing repairs performed and had a window treated and repaired for an "aerial" termite infestation. In 1998 or 1999, another termite company, Sugarland Exterminating, Inc. ("Sugarland"), recommended that the Gads employ Alexis Mallet, Jr., a forensic construction consultant, to investigate a moisture problem.

Beginning in August of 1999, Mr. Mallet and other consultants performed several inspections to investigate the deterioration of wood window frames and framing members, the results of which were summarized in a detailed written report.[1] In his report, Mr. Mallet noted excessive moisture levels at several areas, which he attributed to inadequate or missing sealants. Upon removal of some interior drywalls, he found water stains, damage, and mold, but he believed that the general wall conditions were aesthetic and could be repaired by patching. He recommended proper sealing at all EIFS terminations, the installation of "kick-out" flashing to divert water from the EIFS walls at roof and wall intersections, and routine annual maintenance (to include maintaining sealants, removing debris from gutters, and inspection and monitoring of moisture levels to insure the integrity of the EIFS, wood framed windows, and indoor air quality). In October of 2001, the Gads again consulted Mr. Mallet, complaining of continued deterioration. Similar to Mr. Bellard's conclusion, Mr. Mallet also noted the improper design of the dormer areas; he also found improper sealing around window components. At this time, Mr. Mallet recommended that the Gads consult an architect for further design investigation.

In an affidavit later filed in the trial court, Mr. Mallet stated that the water intrusion he observed in 1999 was limited to some of the wooden windows on the rear wall of the home, the EIFS covered concrete block walls, and the flashing near the flat roof areas. He stated that he never told the Gads or implied in his 1999 report that the EIFS needed to be removed for further investigation because he and the other consultants he employed believed that the cause of the ongoing water damage to the

---

[1]The report is dated December 28, 1999, but Mr. Mallet testified that he did not deliver it to the Gads until February of 2000.

wooden window units was a lack of sealing or caulking. He explained that, when he recommended that the Gads hire an architect in 2001, he believed that the flashing above the windows might have to be redesigned, but he did not suspect even then that there would be problems with the EIFS that would result in the extensive mold later found by the architect. Mr. Mallet did not believe that the water intrusion in the windows and frames observed in 1999 was related to the water infiltration of the EIFS.

Upon Mr. Mallet's recommendation, the Gads consulted an architect, Fabian Patin, in late 2001. Mr. Patin ultimately identified problems with the installation of the EIFS that allowed water to get trapped behind the home's exterior walls, but he stated that the Gads would not have been aware of that water infiltration until the exterior walls were removed in late 2001 or early 2002. He explained that Dryvit's reliance solely on sealants to prevent water intrusion through the EIFS was faulty because sealants ultimately fail. Rather than the temporary protection of sealants, Mr. Patin opined that Dryvit should have instructed contractors that its EIFS be installed with a breathable membrane or flashing system that offered a longer protection life. He also explained that water became trapped behind the foam of the exterior walls because it had no means of escape, such as in "weep holes" that are used with brick veneers. According to Mr. Patin, some of the information that Dryvit provided regarding the installation of its EIFS product showed a "complete disregard for understanding of keeping moisture out of the building."[2]

---

[2]The Gads assert in their appellate brief that Dryvit is involved in a national class action suit concerning the improper installation procedures associated with its product, as well as its failure to disclose resulting problems to purchasers, but that the Gads are not members of that class because the product was supplied for their home before the class inclusion date.

Upon removal of the exterior walls, Mr. Patin also discovered what he believed to be evidence of prior attempts to repair this problem. In the outside wall in the breakfast area, he found a layer of visquine that he considered to be an abnormal configuration that was not likely part of the original construction. It appeared to him that someone had attempted to correct moisture penetration by creating a vapor barrier, but that action had only made the problem worse. Because he was given no information that the Gads had previously taken down the EIFS walls, he assumed the visquine had been installed before they purchased the home. Removal of the EIFS walls also revealed that wood had been replaced in the framing of the parapet wall, indicating previous damage; that low voltage wires had been cut and replaced; and that handwriting on a beam above the garage indicated that it had been replaced in February of 1995, before the Gads had purchased the house.

Defendants argue that the deposition testimony of two Sugarland employees establish that the Gads were informed as early as 1998 that the EIFS, or synthetic stucco walls, needed to be torn down. According to these employees, they informed Mrs. Gad of this condition when the Gads first contracted with Sugarland in 1998 for termite inspection and treatment. Mrs. Gad states in her affidavit, however, that she initially dealt with another Sugarland employee (whose name appears on the original contract). She also notes that those employees testified that this conversation occurred during extensive demolition or repair work, which according to Mrs. Gad, did not occur until late 2001.

**Opinion**

The Gads action against Mr. Granberry, as the vendor of the home, is grounded in redhibition. Under La.Civ.Code art. 2520, "[a] defect is redhibitory when it

5

renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale." Louisiana Civil Code Article 2534 provides, in part, that such an action prescribes as follows:

> A. (1) The action for redhibition against a seller who did not know of the existence of a defect in the thing sold prescribes in four years from the day delivery of such thing was made to the buyer or one year from the day the defect was discovered by the buyer, whichever occurs first.
>
> (2) However, when the defect is of *residential or commercial immovable property*, an action for redhibition against a seller who did not know of the existence of the defect prescribes in *one year from the day delivery of the property was made to the buyer*.
>
> B. The action for redhibition against a seller *who knew, or is presumed to have known, of the existence of a defect* in the thing sold prescribes in *one year from the day the defect was discovered by the buyer*.

(Emphasis added.)

The Gads' action against Ms. Lunn and Van Eaton, however, is based upon fraud or negligent misrepresentation, whereas their action against Dryvit is based upon products liability. These Defendants contend that the Gads' claims against them, which are subject to the one-year liberative prescription for delictual actions, have prescribed under La.Civ.Code art. 3493, which provides: "When damage is caused to immovable property, the one year prescription commences to run from the day the owner of the immovable *acquired, or should have acquired, knowledge of the damage*." (Emphasis added.)

In his deposition, Mr. Patin stated that, after speaking with individuals involved in the construction of the home, it appeared to him that Mr. Granberry self-contracted the project. Even if this testimony is not enough to impute presumed knowledge of

6

the defect to Mr. Granberry as builder of the residence, we find the evidence of prior repairs found by Mr. Patin when he removed the EIFS walls is sufficient to prove actual knowledge to trigger the prescriptive period in La.Civ.Code art. 2534(B).[3] Accordingly, an analysis of the Plaintiffs' discovery or knowledge is applicable to all Defendants.

In *Encalade v. Coast Quality Construction Corp.*, 00-925 (La.App. 5 Cir. 10/31/00), 772 So.2d 244, *writ denied,* 00-3229 (La. 1/26/01), 782 So.2d 634, the court had to decide whether prescription on the plaintiffs' redhibition claim began to run from the time they first noticed settlement of the home or from the time they were informed of possible foundation failure almost four years later. After purchasing the home from its builder in 1985, the plaintiffs first noticed that the house began to settle in 1991, but at that time a structural engineer issued a report concluding that the home was "structurally functional in its current condition at this time." *Id*. at 246. Noticing that the house continued to settle, the plaintiffs obtained another survey in December of 1994 that found a twelve-inch differential between the front and the rear of the home. In January of 1995, another engineer issued a report finding the one-foot differential "excessive and alarming" and predicting structural failure if the house continued to settle. *Id*. They filed suit in February of 1995. Rejecting the defendant's argument that prescription began to run in 1991 when the plaintiffs first noticed settlement of the home, the court stated:

> We believe that Plaintiffs did not have constructive knowledge of an element of the action until the second engineer's report showed that the twelve inch differential in the elevation caused the house to be

---

[3]The Gads point out that the disclosure form provided to them at the time of sale in June of 1995 was signed and dated by Mr. Granberry in 1991, apparently in anticipation of an earlier sale that was not completed. They note that this form predates the replacement of the beam that was found with the handwritten notation indicating that it was replaced in February of 1995.

7

structurally unsound. *Plaintiffs made an effort to investigate a problem which they saw developing.* . . . That engineer's report showed that in 1992, the home was "structurally functional in its current condition at this time." It was not until the January, 1995 report which stated that "if this house continues to settle, it may result in structural failure and/or and [sic] unsafe condition", that Plaintiffs had constructive notice of an essential element of redhibition.

We find that the date of that report, January 20, 1995, is the commencement of the prescriptive period.

*Id*. at 247 (emphasis added).

In *Jordan v. Employee Transfer Corp.*, 509 So.2d 420 (La.1987), the plaintiffs' den flooded on two occasions approximately two months apart, and the supreme court had to decide whether prescription on their redhibition claim began to run after either the first or second incident. When the plaintiffs pulled up the carpet after the first incident, they discovered moldy sideboards and sealants that had been applied over cracks in the den floor, indicating prior, undisclosed water damage. (Before they bought the home approximately one year earlier, the plaintiffs had been provided with an engineer's report indicating that the foundation was structurally sound.) Cleaning personnel suggested to them that the flooding could have been caused by either the cracks in the foundation or leaking flashing on the roof around the chimney. The insurance adjuster who investigated the claim concluded that the water had probably come from a leaking flashing where the chimney met the roof, and the plaintiffs had that condition repaired. When the den flooded a second time, the plaintiffs were able to see water seeping in through the foundation, and further investigation revealed that an agent failed to disclose a second engineer's report finding foundation damage. Concluding that prescription did not begin to run until the second incident, the supreme court stated:

8

When the Jordans first discovered water in their den, they reasonably suspected that the water had entered between the flashing and the chimney. The insurance adjuster, *whose job was in part to identify the origin of the damage*, had reached the same conclusion. The Jordans reasonably relied upon [the first] report's conclusion that the foundation was not structurally unsound as well as [the agent's] representations. For these reasons, *the Jordans made a reasonable decision to attempt to repair the flashing and see if that cured the problem. The Jordans did not discover the origin of the leak until the second substantial rainfall, about two months later.* By this time, the carpet had been removed and water could be seen seeping through the den floor.

*Id*. at 422 (emphasis added).

In *Rihner v. Chevalier*, 98-1032 (La.App. 5 Cir. 3/30/99), 731 So.2d 429, *writ denied*, 99-1234 (La. 6/18/99), 745 So.2d 27, the court relied on *Jordan* to conclude that the plaintiffs' claim against the City of Kenner for negligently approving house plans that were in violation of its building code had not prescribed under La.Civ.Code art. 3493 because they had filed suit within one year of receiving an engineer's report identifying the defect in the plans. The court rejected the City's argument that prescription under Article 3493 began to run when the plaintiffs first noted settlement of their house, finding that they reasonably relied on the assurances of their contractor that the settlement was due to normal conditions.

In the present case, Defendants argue that numerous references to the defective or nonexistent sealants at EIFS terminations throughout Mr. Mallet's 1999 report should have put the Gads on notice of moisture problems with the EIFS walls. However, Mr. Mallet stated in his affidavit that the water intrusion he found was "limited to water being absorbed by the wooden-window units and rough-framed openings" which he attributed to "lack of sealing (caulking)." He stated that he did not recommend further destructive testing of the EIFS walls either in 1999 or in 2001, when the Gads contacted him again after noticing continued deterioration in spite of

9

the recommended repairs. He explained that, when he referred the Gads to an architect in 2001, he suspected there was a defect in the hidden flashing, which could be redesigned by the architect, if he thought it necessary.

The defect that Mr. Patin identified as the cause of the extensive, hidden damage he found was not the inadequate sealants noted by Mr. Mallet, but rather a design flaw in the use of sealants alone as a moisture barrier for the EIFS, combined with the inability of trapped water to escape. Mr. Patin was the first expert to suggest such a system-wide problem to the Gads, and it was his removal of the EIFS walls that exposed the true extent of the damage. Just as the plaintiffs in *Encalade* and *Jordan*, the Gads investigated the problems with their home and made the recommended repairs, but they were not informed of either the origin of the problems or the extent of the damage until consultation with Mr. Patin. (We also note that Mr. Mallet believed the damage he viewed in 1999 was unrelated to the damage discovered by Mr. Patin, as Mr. Mallet expected to find moisture damage in wooden windows that were not completely sealed.) Reviewing the totality of the record before us, we find that the trial court erred in granting Defendants' exceptions of prescription.

**Decree**

For the above reasons, the judgments of the trial court are reversed, and the case is remanded for further proceedings. Costs of this appeal are assessed to Defendants/Appellees.

**REVERSED AND REMANDED.**