**ORLEANS PARISH SCHOOL BOARD**

v.

**UNITED STATES GYPSUM CO., et al.**

**Civ. A. No. 89–70.**

United States District Court,
E.D. Louisiana.

June 5, 1995.

M.H. Gertler of Gertler, Gertler & Vincent, Trevor G. Bryan of Bryan, Jupiter, Lewis & Blanson, New Orleans, LA, for plaintiff.

James C. Gulotta, Jr., Mary L. Dumestre, and Paul J. Masinter of Stone, Pigman, Walther, Wittman & Hutchinson, New Orleans, LA, for defendants.

## ORDER AND REASONS

DUPLANTIER, District Judge.

The Motion to Review and Objection to Magistrate's Report and Recommendation with respect to the Motion for Summary Judgment on Prescription filed on behalf of W.R. Grace & Co.—Conn. ("Grace"), the only remaining defendant, was submitted on memoranda. For the following reasons, I respectfully reject the Magistrate's report and recommendation. I conclude that there is no genuine issue of material fact and that mover is entitled to summary judgment as a matter of law.

The defendant seeks to dismiss as prescribed the claim of plaintiff, Orleans Parish School Board ("School Board"). Defendant contends that the one year prescriptive peri-

od has run because the School Board had sufficient knowledge of asbestos in its school buildings to commence the running of prescription by 1981. No legal action was taken on behalf of the School Board until 1983, and this suit was not filed until 1988.

In 1979, the School Board became aware of the potential dangers of asbestos and its possible presence in its buildings. Triggered by the concerns generated by the asbestos crisis faced by the New York City public schools and by the publications issued by the United States Environmental Protection Agency ("EPA"), in 1979 the School Board examined its building specifications to help identify locations which may contain asbestos, conducted a visual inspection of all of its buildings and facilities, and collected over three hundred bulk samples of suspected asbestos-containing materials ("ACMs") to test for asbestos. Because of budgetary constraints, only twenty-four of the samples, representing samples taken from six schools, were tested in 1979; those tests revealed asbestos in five schools. The School Board abated that asbestos in 1980. In 1980, the Board tested an additional fifty of the bulk samples, finding asbestos in thirty-seven of them. On March 23, 1981, the School Board adopted a resolution recognizing the dangerous presence of asbestos in its schools and the expensive need to abate it. In December, 1981, the remainder of the bulk samples were submitted for testing, pursuant to a state program for free testing of bulk samples taken from Louisiana public schools. By April, 1982, the School Board had received the results of these tests, which indicated that 117 of its 136 buildings contained asbestos.

On January 17, 1983, a class action ("national class action") was filed in the United States District Court for the Eastern District of Pennsylvania against Grace and many other asbestos manufacturers, on behalf of all of the nation's public school districts, including the public schools in Orleans Parish. On March 16, 1988, the School Board opted out of this national class action.[1] On August 31,

1988, the School Board filed this suit against the same group of asbestos manufacturers, seeking to recover the costs incurred when it abated the ACMs. The Board alleges that ACMs manufactured by Grace were found in nineteen of its schools.

The magistrate recommended denying the motion for summary judgment on prescription, concluding that there was a question of material fact as to "when the damages became apparent to the Board" and that mover had not established as an undisputed fact that prescription had begun to run more than a year before the national class action was filed on January 17, 1983. The magistrate also recommended that this court find that the national class action filed in 1983 interrupted prescription. The magistrate's report does not address the defendant's contention that any interruption of prescription that occurred as a result of the national class action was nullified when the School Board opted out of it, or its contention that La.R.S. 9:5644(C) constitutionally could not revive the School Board's otherwise prescribed claims.

## I. STANDARD OF REVIEW AND STANDARD FOR SUMMARY JUDGMENT

A magistrate's report and recommendation with respect to a dispositive motion is reviewed *de novo*. Summary judgment should be granted when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. "When the record—taken as a whole—could not lead a rational trier of fact to find for the nonmoving party, then there is no genuine issue of material fact for trial." *Davis v. Chevron USA, Inc.*, 14 F.3d 1082, 1084 (5th Cir.1994).

## II. THE SCHOOL BOARD'S CLAIM WAS PRESCRIBED WHEN THE CLASS ACTION WAS FILED IN 1983 BECAUSE THE ONE YEAR PRESCRIPTIVE PERIOD FOR DELICTUAL ACTIONS BEGAN RUNNING BEFORE 1982.

In this diversity action, Louisiana's one year statute of limitations for delictual ac-

---

1. The notice informing all class members of the class action gave the members the right to opt out not later than December 1, 1987. (R.Doc. 431, exh. 4). By court order, the date was ex-

tended until March 17, 1988. (R.Doc. 431, exh. 5). Shortly before the extended date, the School Board opted out of the class action. (R.Doc. 431, exh. 6).

tions applies.[2] La.Civ.Code art. 3492 ("Delictual actions are subject to a liberative prescription of one year.").

Under Louisiana law, prescription begins to run "when the person in whose favor a cause of action exists knows or should have known [sic] of the existence of his cause of action." *Trizec Properties, Inc. v. United States Mineral Products Co.*, 974 F.2d 602, 607 (5th Cir.1992); La.Civ.Code art. 3493 ("When damage is caused to immovable property, the one year prescription commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage."). A person knows or should know of the existence of his cause of action once he has received sufficient notice to prompt a reasonable person to investigate further. *See Jordan v. Employee Transfer Corp.*, 509 So.2d 420, 423–24 (La. 1987).[3]

Because the exact date is uncertain, to that extent the magistrate is correct in the conclusion that there is a question as to "when the damages became apparent to the Board." However, the exact date is not a *material* fact, because no rational trier of fact could find that the School Board was not aware of the ACMs in its schools, the dangers posed by them, and the need to remove or abate them by the end of 1981, more than one year before the class action suit was filed.

In 1979, the EPA published a booklet entitled "School Asbestos Program: Questions and Answers," (R.Doc. 425, exh. 8), which the School Board received in the summer of 1979. R.Doc. 425, exh. 9, pp. 16–17. The booklet explained the EPA's concern for the dangers posed by asbestos in the schools, especially friable ACMs that were usually sprayed on, and emphasized the likelihood that many public school buildings contained ACMs. It recommended that schools check building records, conduct a visual inspection of buildings, gather and test bulk samples of suspected ACMs,[4] and take any necessary corrective action.

Prompted by the problems faced by the New York City public schools and by the above-described EPA booklet, Dr. Scarnato,[5] the deputy superintendent of the School Board, testified that he began to "religiously" follow the EPA's suggested guidelines during the summer of 1979.

We had blueprints and we had specifications on most of our buildings, the specifications from which contractors worked. And I asked them to go through those, and find anywhere where asbestos was specified, and then we would do a visual inspection of all of the schools, and we would also take bulk samples, and that is what we did in the summer of '79.

\* \* \* \* \* \*

What we wanted to do was go back to the prints and to the building specifications we had and anywhere there was asbestos specified, we would note that and do a visual inspection, and we needed to determine, in fact, the condition of the asbestos, whether it was friable or solid, and secondly we were to take a sample of that, and

---

2. The prescriptive period for redhibition claims is also one year, running from the date of discovery of the vice. La.Civ.Code art. 2546.

3. The Magistrate relied on *Dean v. Hercules, Inc.*, which held that the prescriptive period begins to run "only from the date the damage [to the plaintiff's trees caused by emissions from the defendant's chemical plant] becomes apparent" because "prescription does not begin to run until the plaintiff knows or should know he has sustained damage." 328 So.2d 69, 73–74 (La.1976). *Dean* uses different language to describe the same rule of law which I apply: prescription does not commence to run until a reasonable person would discover the facts giving rise to the cause of action. In *Dean*, the owner of the trees could not discover his cause of action until he could see the damage to his trees. Here, the School Board could have discovered its asbestos problem once it had a reason to investigate for it.

4. The booklet emphasized the need to sample and test suspected ACMs, because some materials that look like ACMs do not contain asbestos.

5. In his deposition, Dr. Scarnato stated that he became aware of the "monumental type of a problem" faced by the public schools in New York City through educational literature, and that he "felt anything that happens in New York, it is just a matter of time before it happens in New Orleans, so we'd better try to see what the story is." (R.Doc. 425, exh. 9, p. 16).

... it had to be labeled, so we would know exactly where it came from.

R.Doc. 425, exh. 9, pp. 18, 139–40. The person in charge of collecting the samples was also instructed "to take samples of any material that he believed contained asbestos in the school." R.Doc. 425, exh. 10, p. 28.

During the visual inspection of all of its buildings and facilities, the School Board in 1979 collected 301 bulk samples of suspected ACMs to test for asbestos. Because of budgetary constraints, (*see, e.g.,* R.Doc. 425, exh. 9, p. 22–23), only twenty-four samples taken from six schools were tested during the summer of 1979; those tests revealed asbestos in five of the six schools (sixteen of the twenty-four samples). R.Doc. 425, exh. 6.

The July 18, 1979 "New Orleans Public Schools Asbestos Control Program Survey" detailed the findings of the visual inspection, including the location, condition (good or friable), and size (in footage) of the suspected ACMs, and the number and location of samples taken. R.Doc. 425, exh. 5. The November 30, 1979 "Asbestos in New Orleans Public Schools: A Status Report," which was prepared by Dr. Scarnato for the Superintendent, summarized the findings from the visual inspection:

1) All schools, administrative buildings, and support service locations—136 structures—were inspected visually for presence of asbestos with the following results:

99 schools with some friable materials, some of which could be asbestos

20 locations with all asbestos-type material in good condition

17 sites with no asbestos-type material

\* \* \* \* \* \*

4) 301 bulk samples were taken from all sites with any suspected asbestos.

5) 24 of the bulk samples, representing six schools, were subjected to recommended quantitative and qualitative laboratory evaluation at a cost of $40 per sample. In about 60% of the samples, the presence of asbestos was either non-detectable or less than 10%.

6) Cost for testing the remaining samples by the two methods of laboratory analysis recommended by the Environmental Protection Agency is estimated at approximately $22,000.

7) Correction of asbestos problems ... will commence only after completion of careful testing and planning. Cost cannot be estimated at this time; but the process is complex and necessarily expensive.

8) Further testing cannot take place until funds are made available.

R.Doc. 425, exh. 21. The November 30, 1979 report entitled "Asbestos in Schools," which was prepared by Dr. Scarnato and distributed to the Superintendent of the Schools and to the President and Members of the School Board, notified the School Board of the extent of the asbestos problem faced by the New Orleans Public Schools:

The problem [of asbestos in the schools] first surfaced during the last school year when the New York Public Schools were forced to spend millions of dollars to correct the asbestos problem and scare in their schools.

\* \* \* \* \* \*

1. Asbestos-containing materials are widely found in the building materials used in our schools.

\* \* \* \* \* \*

4. E.P.A. and the scientific community believe that any exposure to asbestos involves some health risk. However, they have not been able, at this point, to establish what is a safe level of exposure.

5. The method of defining the extent of the school asbestos problem is somewhat lengthy and costly. It involves visual inspection, sample techniques and a two-process laboratory analysis.

\* \* \* \* \* \*

3. The visual inspection report done this summer found the following:

17 schools with no asbestos

20 schools with all asbestos in good condition

99 schools with some friable materials, some of which could be asbestos. R.Doc. 425, exh. 22. Dr. Scarnato testified that after these reports were prepared, "we believed we had a problem, absolutely." R.Doc. 425, exh. 9, p. 43.

Not only did the School Board know that it had a serious problem with asbestos in its school buildings, but, by the summer of 1980, the School Board began abating the problem. By that summer, the School Board had either removed or encapsulated ACMs that were confirmed to contain asbestos by laboratory testing or where the ceilings were deteriorating. R.Doc. 425, exh. 9, pp. 141, 62–63.[6] In the June 30, 1980 "Asbestos Survey and Estimate," the School Board estimated that it would cost nearly $5,000,000 to abate the asbestos in the school by removal or encapsulation, excluding the cost of removing and replacing the structural steel fireproofing that contained asbestos. R.Doc. 425, exh. 31.

On February 23, 1981, the members of the School Board heard various presentations on the dangers of exposure to asbestos and the extent of asbestos in its schools. On March 23, 1981, they formally adopted a resolution which recognized the health threats posed by exposure to asbestos, that "substantial amounts of asbestos, particularly in sprayed form, have been used in school buildings," that "asbestos exposure presents a hazard in all schools and in all public buildings of the State of Louisiana," and the results of the visual inspection and the limited laboratory testing.[7] R.Doc. 425, exhs. 32–33.

In June 1981, the Board tested an additional fifty samples, discovering that thirty-seven of them had asbestos.[8] R.Doc. 425, exhs. 36–37. This information was forwarded to the Superintendent and to the President and Members of the School Board on July 10, 1981. R.Doc. 425, exh. 38. In December 1981, after the state of Louisiana provided for free laboratory testing of samples of suspected ACMs taken from Louisiana public schools, the School Board submitted the remaining samples plus some additional ones.

The minutes of the School Board meeting on March 14, 1983 include an observation by one of its members to the effect that "years ago" the board had authorized David Berger, class counsel in the national class action, to include it in any class action which he would file. This provides further proof that more than a year elapsed between the Board's decision to join a planned class action and the filing thereof in January of 1983.

Thus it is clear that the one year prescriptive period for this action began to run more than a year before the national class action was filed in 1983. In 1979, put on notice that it may have a problem with asbestos in its schools, the School Board undertook an extensive visual inspection of all of its buildings and facilities, during which it detailed the location of suspected ACMs. That same year, laboratory testing of some of the samples confirmed that many of them actually contained dangerous asbestos fibers. In March 1981, the School Board adopted a resolution publicly acknowledging the dangers posed by asbestos exposure, the "substantial amounts" of sprayed asbestos in its schools, and the hazards posed by them.

■ The School Board contends that prescription does not commence running until a person can identify the likely responsible party. While prescription "[does] not begin to run until a person has a reasonable basis to pursue a claim against a specific defendant," *Jordan*, 509 So.2d at 424, once the facts giving rise to a cause of action are apparent, "the plaintiff must exercise reasonable diligence in ascertaining the identity of the party injuring him." *Dean v. Hercules, Inc.*, 328 So.2d 69, 75 (La.1976). "It is often possible through investigation, architect or contractor recollection, plans and specifications, or state archives, to ascertain the identity of the manufacturers of the asbestos

---

6. Abatement of ACMs remained a priority for the School Board thereafter. *See* R.Doc. 425, exh. 42.

7. The resolution sought Congressional and state funding.

8. The plaintiff concedes that at this point, it knew it had asbestos in four of the nineteen schools still at issue in this litigation. (R.Doc. 453, p. 5).

product used in a particular school." R.Doc. 425, exh. 48, p. X. Once the School Board knew that it had an asbestos problem, it could have begun to identify the asbestos manufacturers within a brief time thereafter through reasonable diligence. The board had in its possession at least some [9] of the building specifications, blueprints, and records which identified at least some of the asbestos manufacturers; it used those materials to help plan its 1979 visual inspection of its schools. To allow the board's failure to use reasonable diligence to identify the asbestos manufacturers to toll the running of prescription would be tantamount to allowing plaintiff to choose when to file suit without regard to the laws of prescription. *See Trizec*, 974 F.2d at 607 ("[A]ctual notice is generally sufficient to place a reasonable person on notice of the existence of a cause of action against a specific person and to start the running of the prescriptive period."); *Jordan*, 509 So.2d at 423 ("[A] plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury."); *Dean*, 328 So.2d at 75 ("[T]he plaintiff must exercise reasonable diligence in ascertaining the identity of the party injuring him.").[10]

▪ The School Board also contends that the prescriptive period did not begin to run until it confirmed through laboratory testing in 1982 the existence of asbestos in *each* of the nineteen schools still at issue in this litigation. To the contrary, under Louisiana law, the prescriptive period begins to run once a person has knowledge sufficient to provoke an inquiry as to the extent of damage; the injured person does not need detailed knowledge of the extent of damage. *See Jordan*, 509 So.2d at 423–24 ("When prescription begins to run depends on the reasonableness of a plaintiff's action.... [P]rescription did not begin to run until they had a reasonable basis to pursue a claim against a specific defendant."; "A plaintiff

will be responsible to seek out those whom he believes may be responsible for a specific injury."); *Dean*, 328 So.2d at 73 (in a suit involving damage to property caused by chemical emissions, prescription begins to run "from the date the damage becomes apparent"). Once the School Board became aware that it had an asbestos problem in 1979, it undertook an extensive visual inspection of every one of its buildings, taking samples of suspected ACMs. This survey, which found suspected ACMs in eighteen of the nineteen schools still at issue, R.Doc. 455, p. 17 n. 46, was sufficient to commence the running of prescription for all the buildings, even if suspected ACMs were not found in each building.

▪ Moreover, the Board did more than just inspect the schools. It tested twenty-four of those samples, confirming that it had asbestos in at least three of the nineteen schools still at issue in this litigation. R.Doc. 425, p. 12–15. By the summer of 1980, it had removed or encapsulated the confirmed ACMs. By the summer of 1981, it had laboratory confirmation that it had ACMs in six of the nineteen schools still at issue. R.Doc. 453, p. 9. The confirmation that it had ACMs in its schools and the commencement of abatement activity show more than sufficient knowledge to commence the running of prescription for all the schools. Prescription was not tolled while the School Board waited until 1982 to spend $22,000 to test the samples. R.Doc. 425, exh. 21. Not later than the end of 1981, the School Board had publicly acknowledged that it had an asbestos problem in its schools, and it had already begun abating it. The School Board could not wait and choose when prescription would begin to run by pleading financial hardship.[11]

▪ Because the School Board knew about the presence of asbestos in its schools, knew of the health hazards created by exposure to

---

9. The School Board admits that it had specifications for three of the nineteen schools still at issue in this litigation. R.Doc. 431, p. 10.

10. The School Board has not shown that it had any additional information on the identity of the ACM manufacturers in 1988 than it had in 1979.

11. Because prescription commenced running for all the buildings after the visual inspection, laboratory testing, and asbestos removal, it is not necessary to reach the issue of whether the School Board has a separate cause of action with a separate prescriptive period for each of its buildings.

asbestos, and could have easily identified the asbestos manufacturers through use of reasonable diligence by the end of 1981, School Board's claims were prescribed when the national class action was filed in January, 1983.[12]

## III. THE LOUISIANA ASBESTOS PRESCRIPTION REVIVAL STATUTE

■■■ A Louisiana statute enacted in 1985 (effective September 6, 1985) deals specifically with prescription of actions involving asbestos abatement:

> Notwithstanding any other provision of law to the contrary, any time limitation or prescriptive period which may be applicable to any action to recover for asbestos abatement work shall not apply or expire until five years after the date on which the party seeking to recover has completed the abatement work or discovered the identity of the manufacturer of the materials which require abatement, whichever is later.

La.R.S. 9:5644(B). This statute does not create a prescriptive period for asbestos abatement suits; it merely suspends the one year period generally applicable to *ex delicto* actions. *Trizec Properties, Inc. v. United States Mineral Products, Co.*, 974 F.2d 602, 606 (5th Cir.1992). As a suspensive statute, it has no effect upon an action which prescribed before its effective date. *Id.* Because the prescriptive period as to the Board's cause of action had already expired when the statute became effective, subsection B is not applicable.

To avoid prescription, the School Board contends that subsection C of the 1985 statute revives its otherwise prescribed action:

> Any person who has an action to recover for asbestos abatement work under the provisions of this Section but whose action is barred by the prescriptive period provid-

ed in R.S. 9:5644 shall have one year from the effective date of this Act [September 6, 1985] within which to bring an action or be forever barred.

La.R.S. 9:5644(C). Observing that "[t]his subsection is far from a model of clarity," *Trizec* concludes that the language "barred by the prescriptive period provided in R.S. 9:5644" refers to the one year prescriptive period provided by Louisiana Civil Code articles 3492 and 3493. *Trizec*, 974 F.2d at 607–08. Thus the beneficiary of the revival grant of subsection C must exercise the grant by filing suit no later than September 6, 1986. The instant suit was filed in 1988. Therefore, even if subsection C is applicable, to avoid defendant's prescription plea, the School Board must demonstrate that the running of the one-year revival period in subsection C was interrupted or suspended prior to September 6, 1985.

## IV. THE CLASS ACTION OPT OUT

■■■ The one-year revival period was interrupted by the pendency of the national class action lawsuit. Under Louisiana law, prescription is interrupted by the timely commencement of an action, and that interruption continues for as long as the suit is pending; once the interruption ceases, prescription commences to run anew. La.Civ. Code arts. 3462, 3463, 3466. This principle applies to class action lawsuits. *Williams v. State of Louisiana*, 350 So.2d 131, 137 (La. 1977) ("[S]ince the class action is brought on behalf of all members of the class, its filing interrupts prescription as to the claims of all members of the class, whether they are noticed before or after the prescriptive delay has terminated."). Defendant contends that the national class action filed in 1983 is of no avail to the School Board, because the class action was not filed within "one year from the effective date" of the 1985 statute. La.

---

**12.** The School Board also makes the spurious contention that prescription did not commence to run before the national class action was filed because it did not know that the asbestos in its school was hazardous. While there may have been scientific uncertainty as to the level at which asbestos exposure becomes harmful (ultimately, the scientific community concluded that any level of exposure was hazardous), the School Board publicly acknowledged that the ACMs in its schools posed a health hazard in its March 1981 resolution. In addition, by encapsulating or removing confirmed ACMs and suspected ACMs in deteriorating ceilings and by estimating the cost of abating all the suspected ACMs, it showed knowledge that the materials were hazardous and had to be abated. Therefore, the scientific uncertainty as to the exact level of exposure that is deemed harmful did not toll the running of prescription.

R.S. 9:5644(C). This literal interpretation of the revival statute has merit. *See Concordia College Corp. v. W.R. Grace & Co.,* 999 F.2d 326, 331–32 (8th Cir.1993). However, I conclude that the pendency of the class action subsequent to the effective date of the 1985 statute has the same effect under Louisiana law as if a new class action had then been brought. The fact that the School Board's claim in the national class action was prescribed prior to the enactment of the 1985 statute is of no consequence; because the board's claim had not been dismissed as prescribed, the action was pending within "one year from the effective date of this Act." La.R.S. 9:5644(C).

 Although the national class action effectively interrupted prescription on this claim, the effect of that interruption was lost to the School Board when it chose to opt out of the class action. A plaintiff loses the benefit of interruption by suit when he voluntarily dismisses the suit; "[i]nterruption [of prescription] is considered never to have occurred if the plaintiff ... voluntarily dismisses" the suit. La.Civ.Code art. 3463. When a case is voluntarily dismissed, the action is treated as if it had never been filed. "The prescriptive period, therefore, is not tolled by the bringing of an action that is later voluntarily dismissed." *Taylor v. Bunge Corp.,* 775 F.2d 617, 619 (5th Cir.1985).

 In *Roger v. Estate of Moulton,* the Louisiana Supreme Court concluded that when the plaintiff dismisses a suit after the defendant has made a general appearance, the interruption is nonetheless effective. 513 So.2d 1126, 1133 (La.1987). After a general appearance by defendant, when plaintiff moves to dismiss, the trial court has discretion to dismiss the suit with prejudice. The Louisiana Supreme Court reasoned that such a situation is not a "voluntar[y] dismiss[al]." *Id.* at 1133.[13] The School Board argues that the *Roger* reasoning is applicable here, be-

cause prior to the board's opt out, defendant had made a general appearance in the class action. Had the interruption by the class action not been nullified by the opt out, the instant suit filed within one year from the date of the opt out would have been timely.

However, opting out of a class action differs from the situation described in *Roger* because opting out does not involve any exercise of discretion by the court. A party who requests exclusion from the class "voluntarily dismisses" the class action insofar as that opting out party is concerned. The court does not have discretion to dismiss that person's claim with prejudice; it only excludes him from the final judgment. Fed.R.Civ.P. 23(c)(2) ("The notice shall advise each member that (A) the court will exclude the member from the class if the member so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion. . . ."). To opt out, the School Board only had to send a notice of exclusion to the clerk of court. (R.Doc. 431, exh. 6) (letter from clerk of court notifying class counsel that the School Board had requested exclusion from the litigation). Under Louisiana law, that notice constituted a voluntary dismissal of the board's class action; therefore, "interruption [of prescription] is considered never to have occurred." La.Civ.Code art. 3463.

Opting out of a class action is analogous to the situation presented in *Plaisance v. Loop, Inc.,* 499 So.2d 736 (La.Ct.App. 4th Cir.1986), *writ denied,* 503 So.2d 23 (La.1987). In *Plaisance,* the court held that prescription did not begun to run anew after the plaintiff voluntarily dismissed a suit without the consent of the defendants, because "voluntary dismissal should not be used to ... forum shop[ ]." *Id.* at 738 (stating that article 3519 (presently, the pertinent part of article 3463)

---

**13.** Revision Comment (b) to La.Civ.Code art. 3463 indicates that the filing of suit followed by a dismissal without prejudice has some effect upon the statute of limitations. If the commentator means to refer to a voluntary dismissal by plaintiff prior to a general appearance by defendant, this comment contradicts the clear language in

article 3463 to the contrary. Needless to say, the code article is law, not the comment:

> [T]he comments in this Act are not part of the law and are not enacted into law by virtue of their inclusion in this Act.

1982 La. Act No. 187, § 6.

"clearly applies.").[14]

By opting out of the national class action, the School Board lost any benefit it gained by being in the class, because opting out of a class action lawsuit, like voluntarily dismissing a suit without the consent of the defendant, is a unilateral, voluntary action by the plaintiff that allows the plaintiff to forum-shop. By opting out of the national class action in 1988, the School Board voluntarily and unilaterally chose to cease being a part of litigation that had been ongoing for five years so that it could bring suit in a court of its own choosing. Under Louisiana law, the class action is considered as if it was never filed. The School Board must accept the consequences of its untimely action; its intention to continue the litigation in a new forum is irrelevant.[15] The national class action was filed after the School Board's claim was prescribed. At most, the revival statute gave the School Board one year from September 6, 1985 to decide whether to remain in the national class action with its revived claim or to opt out of the class action and file its own, separate litigation in a forum of its choice. Because plaintiff waited until 1988 to file this suit, its cause of action is prescribed.

■ In cases dealing with the effect of denial of a class certification upon the suspension of a statute of limitations, the Supreme Court has held that

'[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.' Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is

denied. At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action.

*Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 349, 103 S.Ct. 2392, 2395, 76 L.Ed.2d 628 (1983) (citing *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 552–53, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974)). To protect the efficacy and economy of class action litigation and prevent "a needless multiplicity of actions," *id.* at 350–51, 103 S.Ct. at 2395–96, the running of prescription is tolled [16] for all putative members when the class action is filed, at least until the court decides whether to certify the class.

■ A substantial question exists as to whether under federal law the tolling benefits members of a federal class action who opt out. In *dicta*, the Court has twice suggested that a person who opts out of a class action may nevertheless benefit from the tolling. In *Eisen v. Carlisle & Jacquelin*,[74127194] the Court held that Federal Rule of Civil Procedure 23(c)(2) requires individual notice to all class members who can be identified through reasonable effort of their right to opt out and, if they do not opt out, that they will be bound by the court's judgment. 417 U.S. 156, 172, 94 S.Ct. 2140, 2150–52, 40 L.Ed.2d 732 (1974). The following footnote *dicta* is pertinent:

Petitioner also argues that class members will not opt out because the statute of limitations has long since run out on the claims of all class members other than petitioner. This contention is disposed of by our recent decision in *American Pipe & Construction Co. v. Utah*, which established that commencement of a class action

---

**14.** In *Cameron Parish School Board v. Acands, Inc.*, the court held that previously filed class action suit served to preserve the plaintiff's revived claim, even though plaintiff opted out of the class action and filed its own suit nine months later. 646 So.2d 976, 980 (La.Ct. App.3rd Cir.1994), *writ denied*, 651 So.2d 846 (La.1995). However, *Cameron Parish* did not address the issue raised here, i.e. whether opting out is analogous to a voluntary dismissal.

**15.** The plaintiff correctly contends that the purpose of the notice of the right to opt out is to give individual class members the opportunity to pursue their own claims for personal monetary re-

lief. However, in so doing, the opting-out party assumes the risk that the applicable statute of limitations bars his action.

**16.** In *Chardon v. Fumero Soto*, the Court explained the difference between "tolling" and the "tolling effect." 462 U.S. 650, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983). "Tolling" means that "during the relevant period, the statute of limitations ceases to run," while the "tolling effect" refers to whether the limitations period is merely suspended or begins to run anew once the tolling ends. *Id.* at 652 n. 1, 103 S.Ct. at 2613 n. 1.

tolls the applicable statute of limitations as to all members of the class.

417 U.S. at 176 n. 13, 94 S.Ct. at 2152 n. 13.

In *Crown, Cork,* the Court discussed *Eisen:*

*Eisen*'s notice requirement was intended to inform the class member that he could 'preserve his opportunity to press his claim separately' by opting out of the class. The *Eisen* court ... concluded that the right to opt out and press a separate claim remained meaningful because the filing of the class action tolled the statute of limitations under the rule of *American Pipe.*

*Crown, Cork,* 462 U.S. at 351–52, 103 S.Ct. at 2396 (citations omitted).

The Fifth and the Eighth Circuits have questioned the Supreme Court *dicta,* to the effect that prescription is tolled during the pendency of a class action for a plaintiff who opts out. In *Wood v. Combustion Engineering, Inc.,* the Fifth Circuit noted that "there appears to be a very real controversy as to whether *Eisen* extends *American Pipe* to situations in which a class action member opts out and files separate suit." 643 F.2d 339, 346 (5th Cir.1981). In *Concordia College Corp. v. W.R. Grace & Co.,* the Eighth Circuit stated,

There is some question whether a putative class member can enjoy the benefits of tolling merely by opting out, even though the class action is still pending. The Supreme Court, in *dicta* has intimated as much, even though that is not the language of *American Pipe* or *Crown, Cork & Seal.*

999 F.2d 326, 332 n. 6 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 926, 127 L.Ed.2d 218 (1994). *But see Adams Public Sch. Dist. v. Asbestos Corp., Ltd.,* 7 F.3d 717, 719 n. 1 (8th Cir.1993) ("The fact that this participation ended with a decision to 'opt out' rather than with denial of class certification is irrelevant to the applicability of the *American Pipe* rule."); *Tosti v. City of Los Angeles,* 754 F.2d 1485, 1488 (9th Cir.1985) (holding that limitations period "begins running anew from the date when the class member exercises the right to opt out because before this time, the class member is deemed to be actively prosecuting her rights.").

In this diversity suit, a federal court must follow state substantive law, including a state statute of limitations, as long as it does not directly conflict with federal law.[17] *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) (state statute of limitations are considered substantive for the purposes of *Erie* analysis). In *In re Agent Orange Product Liability Litigation,* the Second Circuit stated,

The limitations periods of *American Pipe* and *Crown, Cork* were derived from federal statutes. Here, we are dealing with Hawaii's limitation statutes. Because none of them provide for tolling in a situation such as exists here, it is doubtful that either *American Pipe* or *Crown, Cork* can be treated as applicable precedent.

818 F.2d 210, 213 (2d. Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988). *But see Adams Public Sch. Dist.,* 7 F.3d at 719 ("[W]e view the federal interest here as sufficiently strong to justify tolling in a diversity case when the state law provides no relief."). In my view, state law governs the effect to be given to an opt out vis a vis a state statute of limitations.

For reasons already stated, I conclude that the Louisiana Supreme Court would decide that the effect of an opt out of a class action is to nullify the interruption of prescription. Allowing the School Board to rely on the national class action from which it opted out to toll the revival period would be tantamount to promoting the very inefficiency, multiplicity of actions, and forum shopping that the class action procedure was designed to avoid. *See* Note, *Statutes of Limitations and Opting Out of Class Actions,* 81 Mich. L.Rev. 399, 428–31 (1982).

---

17. The three relevant Supreme Court cases involved federal question jurisdiction. *Crown, Cork,* 462 U.S. at 346, 103 S.Ct. at 2394 (Title VII employment discrimination); *Eisen,* 417 U.S. at 158, 94 S.Ct. at 2144 (federal securities and antitrust laws); *American Pipe,* 414 U.S. at 540–41, 94 S.Ct. at 760 (federal anti-trust laws).

## V. ALTERNATIVELY, LOUISIANA R.S. 9:5644(C) CONSTITUTIONALLY COULD NOT REVIVE AN OTHERWISE PRESCRIBED ACTION.

 Defendant argues that applying subsection C of the 1985 revival statute, Louisiana R.S. 9:5644(C), to an action already prescribed on the effective date of the statute would violate the Louisiana constitution. I agree, and I grant defendant's motion for summary judgment on this alternative basis. I have concluded that the School Board's claim is prescribed even if the 1985 statute can constitutionally be applied. Nevertheless, for the sake of completeness, I reiterate my view expressed in 1992 that the Louisiana Supreme Court would agree with defendant's contention. *City of New Orleans v. W.R. Grace & Co.—Conn.,* 1992 WL 125371 (E.D.La.1992) (holding that, in reference to La.R.S. 9:5644(B), "[o]nce a plaintiff's case of action is barred by liberative prescription it cannot [under the Louisiana constitution] be revived by a subsequent legislative enactment"),[18] *aff'd,* 985 F.2d 558 (5th Cir.1993) (affirmed on other grounds in an unpublished opinion).

 Under Louisiana law, the running of prescription gives the party in whose favor prescription has run the substantive right to plead the exception of prescription. *Chance v. American Honda Motor Co., Inc.,* 635 So.2d 177, 178 (La.1994). "Because the defendant acquires the right to plead the exception of prescription, a change in that right constitutes a substantive change in the law as applied to the defendant." *Id.* at 178 (citing *St. Paul Fire & Marine Ins. Co. v. Smith,* 609 So.2d 809, 817 (La.1992) ("Substantive laws either establish new rules, rights, and duties or change existing ones.")). *See also Cameron Parish Sch. Bd.,* 646 So.2d at 979 ("[W]e recognize that a defendant's right to assert the peremptory exception of prescription is a vested right.").[19]

The due process clause of the Louisiana constitution prohibits the revival of a prescribed cause of action.[20] Because the School Board's cause of action was prescribed long before the national class action was filed, it could not be revived by subsection C of the 1985 statute, La.R.S. 9:5644(C).

"Statutes of limitations ... cannot consistently with [the due process guarantees in the] state [ ] constitution[ ] apply retroactively to disturb a person of a pre-existing right." *Lott v. Haley,* 370 So.2d 521, 523–24 (La. 1979) (refusing to apply a shortened prescriptive period retroactively, because it would divest a plaintiff of his vested right to his cause of action). "In Louisiana, the lapse of time necessary to prescribe vests a right in the party in whose favor it has run." *Ayo v. Control Insulation Corp.,* 477 So.2d 1258, 1260 (4th Cir.1985), *writ denied,* 481 So.2d 1349 (La.1986); *Chance,* 635 So.2d at 178.

 As a vested right, the substantive right to plead prescription cannot be divested or disturbed without violating the Louisiana constitution's guarantee of due process of

---

**18.** Neither the Louisiana Supreme Court nor the United States Fifth Circuit Court of Appeal has decided this precise issue.

The Louisiana Supreme Court has confronted the issue of retroactive application of a change in other prescription statutes several times in recent years. In one of these cases, *White v. West Carroll Hosp., Inc.,* dealing with prescription of medical malpractice claims, the Louisiana Supreme Court pointed out that the case attracted the attention of several amici. * * * Amici have an indirect interest in the outcome of this litigation because they are involved in federal litigation in which the retroactive application of the asbestos abatement statute, La. R.S. 9:5644, is at issue. 613 So.2d 150, 153 n. 8 (La.1992). *See also Wimberly v. Gatch,* 635 So.2d 206, 210 n. 10 (La.1994); *Chance,* 635 So.2d at 178.

**19.** *Cameron Parish Sch. Bd.* did not address the constitutionality of 9:5644(C), because none of the parties questioned it. 646 So.2d at 980.

**20.** In *Chase Securities Corporation v. Donaldson,* the Supreme Court held that statutory revival of a time-barred cause of action does not violate the federal constitution's due process protection. 325 U.S. 304, 311, 65 S.Ct. 1137, 1141, 89 L.Ed. 1628 (1945). However, it stated that many state courts "have, as they are privileged to do, so interpreted their own easily amendable constitutions to give [their own due process] clauses a more rigid interpretation ..." *Id.* at 312, 65 S.Ct. at 1141–42 and n. 9.

law.[21] *See Gay v. C & D of Shreveport,* 645 So.2d 280, 282 (La.Ct.App.2d Cir.1994) ("Retroactive application of a prescriptive provision is foreclosed when the cause of action has prescribed before the provision takes effect."); *L.V. v. Liberto,* 612 So.2d 812, 816 n. 4 (La.Ct.App. 1st Cir.1992) ("Prescription, having already accrued in favor of the school board, is a vested right for this defendant that may not be divested by a retroactive application of the amendment."). Because the right to plead prescription vested once prescription ran, Louisiana R.S. 9:5644(C) could not revive it. *Hall v. Hall,* 516 So.2d 119, 120 (La.1987) ("The enactment of that [codal] article could not revive the already prescribed action."); *Chance,* 635 So.2d at 180 (J. Hall concurring); *Ayo,* 477 So.2d at 1260–61 (amendment to prescriptive statute could not revive already prescribed claims, because "liberative prescription laws, ..., cannot apply retrospectively to disturb a person of a preexisting right").

## VI. CONCLUSION

I grant defendant's motion for summary judgment on two grounds:

1. Even if subsection C of the 1985 Louisiana revival statute applies, prescription has run because the School Board opted out of the class action;

2. Alternatively, applying subsection C of the 1985 statute to the otherwise already prescribed claim would offend the Louisiana constitution.

---

**21.** The defendant wrongly contends that the running of prescription extinguishes the underlying civil obligation, relying on *Louisiana Health Service and Indemnity v. McNamara,* 561 So.2d 712 (La.1990). *See also Chance,* 635 So.2d at 180 (J. Hall concurring) (stating that considering the right to plead prescription to be a vested right is "consistent with the civilian teachings that the effect of the running of prescription is to extinguish the underlying obligation"). However, in *Louisiana Health Service and Indemnity v. Tarver,* the Louisiana Supreme Court corrected itself, emphasizing that the Civil Code article 3447 states that "[l]iberative prescription is a mode of barring of actions as a result of inaction for a period of time" and that "the language of the 1870 code [liberative prescription being a manner of discharging debts and a peremptory and perpetual bar] *'is not accurate and has not been reproduced in this [1982] revision.'*" 635 So.2d 1090, 1097 (La.1994) (emphasis added by La. Sup.Ct.). Therefore, the running of liberative prescription bars the action but does not extinguish the underlying obligation.